**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BLACK CARD, LLC,

     Plaintiff - Appellant,

v.

VISA U.S.A., INC.,

     Defendant - Appellee.

No. 17-8040
(D.C. No. 2:15-CV-00027-SWS)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.
_____

On December 31, 2013, a five-year contract—called the Promotional

Agreement—between the luxury credit card company Black Card, LLC (Black Card)

and the credit network Visa U.S.A. (Visa) expired. Under the terms of the

Promotional Agreement, Black Card agreed to develop and promote its credit card on

the Visa network in exchange for annual payments by Visa. After the expiration of

the Promotional Agreement, the parties attempted to negotiate a new contract over

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however,
for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R.
32.1.

the course of several months in 2014.  Negotiations broke down, however, and Black Card eventually switched to the MasterCard payment network.

Black Card sued Visa under several contract and tort theories, including breach of contract, breach of implied contract, promissory estoppel, equitable estoppel, and unjust enrichment.  Black Card also sought punitive damages.  The district court granted summary judgment to Visa on all claims.  We reverse on the breach of implied contract, unjust enrichment, and punitive damages claims, and affirm on the breach of contract and estoppel claims.

## I.

Visa is a technology company that enables consumers and businesses to make and receive payments using credit cards through the company's electronic payment network.  Visa is a payment network, not a bank, so it does not issue credit cards or have a direct relationship with cardholders.  Rather, it partners with banks that issue credit cards, allowing the banks to use Visa's payment network.  Visa processes the transactions made by cardholders, while the issuing bank extends credit, pays sellers, and bills cardholders.  To use the payment network, issuing banks must agree to comply with Visa's regulations and brand standards.

Banks often contract with third parties called "co-brand partners" to market cards to the co-brand partner's customers.  A familiar example is an airline credit card, which offers rewards to cardholders like frequent-user points or free checked bags.  Co-brand partners typically do not have a contractual relationship with the payment network.  Instead, the payment network will contract directly (and only)

2

with the issuing bank and give that bank the right to issue cards with access to the payment network. The issuing bank is then free to make its own arrangement with co-brand partners to promote and market those cards.

Black Card is a co-brand partner that develops and markets luxury credit cards for affluent individuals. In 2008, Black Card partnered with Barclays Bank Delaware (Barclays). Barclays agreed to be the issuing bank for the Black Card credit card, while Black Card marketed the credit card to new cardholders and provided cardholders with exclusive benefits. Barclays and Black Card decided to issue the card on the Visa network.

Because Barclays was already an approved card issuer on the Visa network, Visa's approval or involvement was not required. However, in this instance, Visa decided to contract directly with Black Card. On November 20, 2008, Visa and Black Card signed the Promotional Agreement, under which Black Card would develop and promote the Barclays-issued Black Card credit card exclusively on the Visa network in exchange for annual payments by Visa. Black Card was obligated to use these payments solely to market and promote the Black Card credit card. Visa had the right to review and approve "[a]ll written and broadcast materials" created by Black Card, provided such approval "will not be unreasonably withheld." The Agreement further stipulated that "[e]ach party will allow the other party at least ten (10) business days from receipt to review such materials. If for any reason the reviewing party does not respond within ten (10) business days, such materials will

be deemed approved." The Agreement was to last five years, expiring by its terms on December 31, 2013.

Over the course of the contractual relationship, Visa and Black Card often disputed the use of the word "Visa" in Black Card advertisements. Visa was concerned about potential consumer confusion that the Black Card credit card was a Visa product. As such, Visa objected to marketing materials that referred to the card as the "Visa Black Card," instead preferring the term "Black Card Visa Card" or simply "Black Card." Despite these objections, Visa sometimes approved the release of marketing materials that contained the "Visa Black Card" phrase.

On December 11, 2013, Black Card sent Barclays the proposed designs for its January direct mail marketing campaign, which Barclays forwarded to Visa on December 16 for approval. That same day, Visa responded to Barclays via email: "Please hold the presses . . . will give you a shout." Four days later, on December 20, Black Card resubmitted the direct mail materials with a number of amendments, including removal of the phrase "Visa Black Card" in several places.

Over the course of the next four weeks, Visa delayed providing an answer regarding approval of the marketing materials, despite inquiries from Barclays. On January 15, Black Card CEO Scott Blum (Blum) emailed Visa asking for an update on the approval of the marketing materials. On January 17, 2014, Visa approved the amended marketing materials on a "one-time only basis." Black Card claims this delay cost them significant marketing momentum.

4

The Promotional Agreement expired on December 31, 2013. Earlier, on December 2, Visa reached out to Black Card about signing a new contract and anticipated having a formal offer by December 16. Blum asserts that he was assured by a Visa executive that a new agreement was "going through legal" and the parties should continue "business as usual." The expiration date on the Promotional Agreement was fast approaching, but Visa informed Black Card that "if we can target signing a new contract by March 31, 2014, we will not have any interruption in payments to Black Card," because Visa could back-date the agreement to the beginning of the quarter. In other words, the parties did not need to immediately sign a new agreement, but if they delayed too long, accounting concerns might disrupt the annual incentive payments.

Black Card signed a new five-year contract with Barclays on January 1, 2014, meaning Barclays would continue issuing the Black Card credit card. Though the Visa/Black Card written contract had expired, Barclays and Black Card could and did still use the Visa payment network without a contract between Visa and Black Card. Following the expiration of the contract, Black Card continued to market its credit card, and Barclays continued to submit those marketing materials to Visa for approval—the same process under which the parties operated while the Promotional Agreement was in effect. While Visa approved the marketing campaigns in early 2014, it expressed reservations about the "Visa Black Card" phrase that Black Card continued applying.

On January 27, 2014, Blum emailed Visa regarding a major branding overhaul of the Black Card brand. Black Card intended to change its company name to Luxury Card,[1] revise its packaging and card designs, and issue two new credit cards (the "Titanium" and "Gold" cards). On February 10, Visa replied: "Please proceed in marketing 'business as usual' until we have the opportunity to discuss. Continue to run materials past Barclays for their review and approval."

On February 18, Visa emailed Black Card informing Black Card that Visa had processed "the final payment owed to Black Card under the terms of our expired agreement."

Negotiations for a new contract between Visa and Black Card dragged on through 2014. At one point, Visa offered a financial package to Black Card worth up to $55 million. At this juncture, Black Card claims it was operating under the assumption that an implied contract existed, extending the terms of the expired Promotional Agreement until a new deal was signed. However, negotiations stalled and no new contract materialized.

During 2014, Visa withheld approval of Black Card marketing materials three times—in May, June, and July. Black Card claims the ensuing delays to revise the materials were financially harmful and they negatively affected the performance of the company. Black Card was in the process of debuting the new Gold and Titanium

---

[1] For continuity's sake, we will continue to refer to the company as "Black Card."

Cards and claims to have been forced to stall the rollout until Visa's concerns were addressed.

In the summer of 2014, apparently frustrated with its relationship with Visa, Black Card began negotiating with MasterCard, a rival payment network, about moving Black Card onto the MasterCard payment network. Black Card and MasterCard signed an agreement in November 2014, and Black Card stopped marketing the Visa-branded credit card in April 2015. Existing Black Card credit cards moved to MasterCard's network and new customers could apply for a MasterCard Black Card in January 2016. The terms of the Black Card/MasterCard agreement are similar to the expired Black Card/Visa agreement: Black Card would exclusively use the MasterCard network and obtain approval before sending out marketing materials, and MasterCard would pay Black Card fees based on transaction volume.

Black Card claims it was forced to "abandon" hundreds of millions of dollars it invested in marketing the Visa Black Card after it switched to MasterCard. It asserts that it lost a significant percentage of its cardholder population by switching.

Black Card filed suit against Visa in February 2015. The district court had diversity jurisdiction under 28 U.S.C. § 1332. Black Card alleged nine claims for relief against Visa: (1) breach of implied duty of good faith and fair dealing; (2) breach of contract; (3) breach of implied-in-fact contract; (4) equitable estoppel; (5) promissory estoppel; (6) interference with a contractual relationship; (7) interference with a prospective economic advantage; (8) unjust enrichment; and (9) punitive

7

damages.  Black Card conceded summary judgment for claims six (interference with a contractual relationship) and seven (interference with a prospective economic advantage).  After discovery, Visa moved for, and the district court granted, summary judgment on all remaining claims.  Black Card appeals that judgment.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## II.

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This court reviews grants of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party.  *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1095 (10th Cir. 2017).  Summary judgment is inappropriate if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  A grant of summary judgment will be upheld if "the evidence is so one-sided that one party must prevail as a matter of law."  *SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (quotations omitted).  We apply these standards to each of Black Card's claims.

8

## A.

We turn first to Black Card's breach of contract claim.

Under the Promotional Agreement, Visa had the right to review and approve "[a]ll written and broadcast materials" created by Black Card, provided such approval "will not be unreasonably withheld." The Agreement further stipulated that "[e]ach party will allow the other party at least ten (10) business days from receipt to review such materials. If for any reason the reviewing party does not respond within ten (10) business days, such materials will be deemed approved." A411.

Black Card argues that Visa unreasonably withheld approval of marketing materials in December 2013—the last month in which the Promotional Agreement was operative. On December 11, Black Card emailed the marketing materials for the January marketing campaign to Barclays, and on December 16, Barclays forwarded the materials to Visa. Visa responded four minutes later: "Please hold the presses . . . will give you a shout." A278 (ellipsis in original). Black Card "updated" the materials to remove several uses of the phrase "Visa Black Card" and sent them to Barclays on December 20, who sent them on to Visa for approval. A284. Email chains between Barclays and Visa from late December and early January indicate that Barclays was pushing Visa for its response—approve or disapprove—to the amended materials. *See, e.g.*, A283. On January 17, Visa approved the marketing materials. A287.

Black Card contends that Visa's instruction to "hold the presses" constituted a rejection of the marketing materials, and because the materials were "substantially

9

identical to previous mailings," Visa's rejection was unreasonable, in violation of the Agreement. *See* Aplt. Br. at 28. Visa points out that the *amended* materials were eventually approved, but Black Card argues that is irrelevant. According to Black Card, the amended materials have no bearing on the matter, because the purported rejection of the original materials, sent to Visa on December 16, is the foundation of its claim. *See* Reply Br. at 2–5.

Black Card, however, failed to present this theory to the district court. Instead, it argued that Visa exhibited a "pattern of delaying and stalling" which ultimately constituted a rejection. *See* A108. Nowhere did it argue that the December 16 "hold the presses" email constituted a rejection in and of itself, even when prompted to do so by the district court.[2] Its argument that it preserved the "hold the presses" argument hinges on a single citation in its statement of facts in its summary judgment response brief. Black Card stated that: "In December, 2013, Visa—for the first time—would not approve Black Card's January direct marketing campaign. (Ex. 35, Barclays 107-108.)" A103. Exhibit 35 was the "hold the presses" email. The next paragraph refers to Visa's ultimate approval of the amended marketing materials on January 17—but did not inform the district court that the materials eventually approved were different from the original materials. A104 ¶ 26.

---

[2] At the summary judgment hearing, the district court asked: "And there was an express rejection to [] Black Card's material [in December 2013], or was there just a delay in responding to it?" Counsel for Black Card replied: "Your Honor, to—I know we attached that communication, and I—I admit I do not have that specific communication in front of me, Your Honor." SA1415. Again, rather than squarely presenting the district court with its argument, Black Card referred the court to the record.

10

Black Card's singular reference in the fact section of its brief to the "hold the presses" email was insufficient to alert the district court that the email was the basis of its breach of contract claim. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Furthermore, when "an issue is raised but not pursued in the trial court, it cannot be the basis for the appeal." *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 722 (10th Cir. 1993). "Where a litigant changes to a new theory on appeal that falls under the same general category as an argument presented to the trial court or presents a theory that was discussed in a vague and ambiguous way, the theory will not be considered on appeal." *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1142 (10th Cir. 2004) (quotations and brackets omitted). Parties cannot present one version of an argument and then, when that fails, try a different version on appeal. *S. Hosp*, 393 F.3d at 1142. Further, we have held that an "argument that could be inferred from a trial exhibit, but was not otherwise discussed, could not be argued on appeal." *Lyons*, 994 F.2d at 722 (referencing *N. Nat. Gas Co. v. Hegler*, 818 F.2d 730, 734 (10th Cir. 1987)). In this case, Black Card never argued to the district court that the "hold the presses" email constituted a rejection, so the argument is waived on appeal.

Considering the argument that Black Card *did* pursue before the district court—that Visa's "pattern of delaying and stalling" constituted a rejection of the marketing materials—we agree with the district court that there was no rejection here, and therefore no breach of contract. It is true that Visa told Black Card to "hold

11

the presses" on December 16 after receiving the original materials, and delayed in providing its response to the amended materials until January 17. But a delay is not a rejection. To the contrary, under the terms of the Promotional Agreement, a delay is an acceptance. Per the Agreement, "[i]f for any reason the reviewing party does not respond within ten (10) business days, such materials will be deemed approved." The original materials were superseded by the amended materials on December 20, and once ten business days elapsed, the amended materials were deemed approved. We therefore affirm the district court's grant of summary judgment on Black Card's breach of contract claim.

**B.**

We next examine Black Card's claim that the parties formed an implied contract extending the Promotional Agreement. Black Card asserts that the conduct and communications of both Black Card and Visa demonstrate that both parties were continuing to operate under the terms of the Promotional Agreement until they agreed to a new written contract, or until negotiations were abandoned. The district court concluded the evidence showed that mutual assent to a new agreement was absent, and therefore the parties were not subject to an implied contract. After reviewing the record and the parties' submissions, we conclude a genuine factual dispute exists as to whether the parties agreed to be bound by an implied contract. Accordingly, we reverse.

12

The existence and terms of an implied contract are manifested by conduct. Cal. Civ. Code § 1621.[3] "[A] contract implied in fact consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words." *Retired Emps. Ass'n of Orange Cty., Inc. v. Cty. of Orange*, 266 P.3d 287, 290 (Cal. 2011) (quotation omitted). The terms of an implied contract "ordinarily stand on equal footing with express terms." *Foley v. Interactive Data Corp.*, 765 P.2d 373, 385 (Cal. 1988). "A commonly cited example [of an implied contract] is where parties continue to perform under the terms of their agreement after the written contract expires." *Telecom Asset Mgmt., LLC v. Fiberlight, LLC*, 203 F. Supp. 3d 1013, 1020 (N.D. Cal. 2016) (applying California law); *see also* 17A Am. Jur. 2d *Contracts* § 17 ("If, after the expiration of a contract, the parties to the contract continue to perform under the contract's terms, the parties' relationship is generally governed by a new, implied in fact contract that incorporates the terms, or substantially the same terms, of the expired contract.") (footnotes omitted).

---

[3] The Promotional Agreement included a choice of law provision that selected California law in the event of litigation. The district court determined that California law governs the implied contract claim. *See Black Card, LLC v. Visa U.S.A., Inc.*, No. 2:15-CV-00027, 2017 WL 3600721, at *3–4 (D. Wyo. Apr. 11, 2017). Neither party challenged the district court's choice of law analysis regarding this claim on appeal, so we also apply California law. *See, e.g.*, *Strickland Tower Maint., Inc. v. AT&T Comm., Inc.*, 128 F.3d 1422, 1426 (10th Cir. 1997) ("The district court applied Oklahoma law to this case and neither party challenges that finding on appeal. Therefore, we accept the view of the district court that Oklahoma law applies.").

Black Card argues that the conduct and communications of Black Card and Visa demonstrate that the two parties formed an implied contract after the expiration of the Promotional Agreement. Specifically, Black Card contends there was an accepted agreement between the two parties, not expressed in writing, that they would continue "business as usual" while negotiations for a new written contract were being conducted. According to Black Card, the parties had agreed to continue to be bound by the terms of the Promotional Agreement in the interim between the expiration of the first contract and the execution of the second—until it became obvious that agreement to a second contract would not be forthcoming.[4]

After resolving all factual disputes in Black Card's favor, as we must when reviewing a grant of summary judgment, we conclude the evidence raises a genuine issue of fact whether the implied contract existed. Based on the following record evidence, a reasonable factfinder could determine that Visa performed either under an alleged implied contract with Black Card, or for some other reason. Summary judgment is therefore improper.

---

[4] Visa contends that Black Card argued below that the implied contract was a renewal of the entirety of the Promotional Agreement, whereas here Black Card argues for the first time that the implied contract covers only the period between the expiration of the first written contract and the execution of the second. We disagree with Visa's characterization. Black Card argued that the parties "were acting under an implied continuation of the Promotional Agreement," and the "implied contract [was] similar to that created in a 'hold-over' situation." A109, 111, Black Card's Resp. to Visa Mot. Summ. J. at 14, 16. Given the context of the case, we think it clear that Black Card was arguing below that the purported implied contract was a stopgap between written agreements.

On December 2, 2013, Visa informed Black Card via email that a proposal for a new contract was in the works at Visa. A277. Visa stated that "if we can target signing a new contract by March 31, 2014, we will not have any interruption in payments to Black Card" because the contract could be backdated to the beginning of the year. *Id.* Black Card CEO Scott Blum stated in a deposition that he was assured via phone call with a Visa executive in December 2013 that the parties would continue "business as usual":

> Well, I called [the Visa executive] saying, "Hey, our agreement's about to end," and he says, "Well, we've already got it approved, it's just" –you know, "just going through legal. Don't worry about it. It's on its way. It's business as usual.["] So I said, "Okay, I don't like doing business without having an agreement in place, but I'll—I trust you on this," and that was basically the conversation.

A251.

By the end of 2013 and the beginning of 2014, the parties were bogged down in their dispute over approval of the January marketing materials, but no mention was made of the expired Promotional Agreement. *See* A278–87. On January 27, Black Card emailed Visa detailing Black Card's rebranding to Luxury Card, and the introduction of two new cards to complement the Black Card credit card. SA416. Visa responded on February 10: "Please proceed in marketing 'business as usual' until we have the opportunity to discuss. Continue to run materials past Barclays for their review and approval." *Id.*

Throughout 2014, Black Card continued to submit marketing materials to Barclays, who submitted them to Visa for approval. *See* A231–244. Black Card

remained on the Visa network during 2014. Visa continued to process transactions made by Black Card credit cards, and charged its customary fees on each card swipe.

On these facts a reasonable factfinder could conclude that the parties were operating under an implied contract. Visa made assurances to Black Card that it was "business as usual" despite the expiration of the Promotional Agreement. Additionally, the parties continued performing under the terms of the Agreement: before each marketing campaign in 2014, Black Card submitted its marketing materials to Visa for approval or disapproval before publishing them, and Visa continued to exercise those approval rights. Black Card also continued to use the Visa payment network. It is true that Black Card could have used the Visa network without any contract with Visa, but that is an issue for a factfinder to resolve. A reasonable jury could find that Visa's assurances and the parties' conduct were evidence of an implied contract.

Visa, of course, sees the evidence in a different light, and asserts that a reasonable jury could not find the existence of an implied contract. But when determining whether an implied contract exists, reasonable competing interpretations of the evidence should be resolved by a jury. *Anderson,* 477 U.S. at 254 ("[T]he weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). For example, regarding the February 10 "business as usual" email, Visa contends that its response was an encouragement for Black Card to continue running marketing materials through Barclays for approval, pending a Visa/Black Card discussion of Black Card's rebranding plan. SA416. In

16

other words, Visa claims the email was unrelated to an extension of the Promotional Agreement. This is a factual disagreement that is most appropriately resolved by a jury.

Visa also points to its February 18 email to Black Card, which stated that Visa's February 2014 payment "represents the final payment owed to Black Card under the terms of our expired agreement." SA338. According to Visa, this email represents a clear expression that the parties' contractual relationship was finished. Black Card, though, views the email as mere confirmation that the *written* agreement had expired, with no bearing on whether the parties were operating under an *implied* agreement. Again, we find that a reasonable dispute exists about the meaning of the evidence, rendering summary judgment inappropriate.

Visa also argues that Black Card's continued submission of marketing materials for Visa's review is equally consistent with the absence of a contractual arrangement. For example, Visa asserts that Black Card was obligated to present its marketing materials to Barclays for Visa approval, because Visa had the right to review products that display the Visa brand. Additionally, Visa claims that, because Black Card had executed a new five-year deal with Barclays in January 2014, Black Card was bound to continue marketing its cards anyway. Regardless of the merits of

17

these arguments,[5] they suffer from the same deficiency: they are competing, but not dispositive, interpretations of the behaviors of the parties.

Finally, Visa argues that the terms of the supposed implied contract were too vague and indefinite to support its existence. "In order for a contact to be formed, the contract terms must be clear enough that the parties can understand what each is required to do." *Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1073 (N.D. Cal. 2006) (citing Restatement (2d) of Contracts § 33(1) (1981)). "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." *Ladas v. Cal. State Auto. Ass'n.*, 23 Cal. Rptr. 2d 810, 814 (Cal. Ct. App. 1993) (quotation omitted). Visa claims that the duration, financial terms, and other necessary provisions of the supposed implied agreement were undecided. But if Black Card is right and the parties agreed to continue operating under the Promotional Agreement, then the terms are simply those of the Agreement. The only change would be the duration, which, according to Black Card, would be until the new contract was signed or negotiations proved fruitless.

Based on the foregoing, we reverse the district court's grant of summary judgment on Black Card's implied-contract claim. Additionally, because the district court determined no implied contract existed, it also granted summary judgment for

---

[5] We note that the record provides thin support for Visa's claim that it possesses the right of prior review of marketing materials for every co-brand credit card that uses its network. Again, however, that is an issue to present to the jury.

Visa regarding Black Card's claim that Visa breached the duty of good faith and fair dealing inherent in the implied contract. *See Horn v. Cushman & Wakefield W., Inc.*, 85 Cal. Rptr. 2d 459, 474 (Cal. Ct. App. 1999) ("Where there is no underlying contract there can be no duty of good faith arising from the implied covenant."). That ruling depends on the now-reversed grant of summary judgment on the implied-contract claim. Accordingly, we reverse the district court's holding as to Black Card's claim of a breach of the duty of good faith and fair dealing as well.

### C.

Black Card also presses claims of promissory and equitable estoppel against Visa. On these claims, we affirm the district court's grant of summary judgment.

"Under California law, the elements of promissory estoppel are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance."[6] *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 792 (9th Cir. 2012) (citing *U.S. Ecology, Inc. v. State*, 28 Cal. Rptr. 3d 894, 905 (Cal. Ct. App. 2005)). "Estoppel cannot be established from preliminary discussions and negotiations." *Garcia v. World Sav., FSB*, 107 Cal. Rptr. 3d 683, 695 (Cal. Ct. App. 2010) (quotations and ellipsis removed). To be enforceable, a promise must be "definite enough that a court can determine the scope of the duty[.]" *Id.* at 696.

---

[6] Neither party disagrees with the district court's decision to apply California law to the promissory estoppel claim. *See* Aplt. Br. at 42 n.13; Aple. Br. at 40 n.11.

19

Black Card contends that all four elements of promissory estoppel are present here. It claims that Visa's encouragement to continue "business as usual" was a clear and unambiguous promise; it relied on that promise by continuing to spend millions of dollars on co-branded marketing materials; such reliance was reasonable and foreseeable by Visa; and it was injured when Visa "drove Black Card off the Visa network," resulting in the loss of its marketing investments and a reduced subscriber base. Aplt. Br. at 42.

We agree with the district court that Visa made no clear and unambiguous promise on which Black Card reasonably relied. Black Card bases its claim on the email response from Visa stating: "Please proceed in marketing 'business as usual' until we have the opportunity to discuss. Continue to run materials past Barclays for their review and approval." SA416. This does not constitute a clear and unambiguous promise. Visa did not tell Black Card that a long-term contract would definitely be forthcoming, and it did not encourage Black Card to continue to spend "millions of dollars" on marketing materials. Additionally, the email's conditional nature ("until we have the opportunity to discuss") makes it even more ambiguous. *See Laks v. Coast Fed. Sav. & Loan Ass'n*, 131 Cal. Rptr. 836, 839 (Cal. Ct. App. 1976) ("[A] conditional commitment . . . places the offeree on notice that finalization of the terms will undoubtedly require further negotiations."). The parties were indisputably involved in negotiations to renew the written agreement, and at no point did they come close to agreeing to terms. Because "[e]stoppel cannot be established from preliminary discussions and negotiations," *Garcia*, 107 Cal. Rptr. 3d at 695

20

(quotations and ellipsis removed), the district court properly granted summary judgment on Black Card's claim.

Black Card states that the district court erred by "conflating the ongoing relationship between the parties during the interregnum with their negotiations over their future relationship." Aplt. Br. at 43–44. But even if that is the case, then Black Card's reliance on the promise would have been unreasonable or unforeseeable, failing the third prong of promissory estoppel.[7] If Visa's promise was to continue "business as usual" until either (1) a new agreement was signed or (2) the negotiations broke down, Black Card should accordingly have been on notice that the negotiations might fail. Visa never represented that a new contract was a certainty, and Black Card's expenditures on marketing materials was a gamble that such an agreement would be reached. Black Card's reliance would only be reasonable if Visa promised that a long-term agreement would emerge, which Black Card does not allege. Even if we consider the events as Black Card frames them, the elements of promissory estoppel are absent here.

Summary judgment on Black Card's claim of equitable estoppel was also appropriate. Under Wyoming law, equitable estoppel is a tort doctrine that gives rise to relief "when a party, by acts, conduct, or acquiescence causes another to change his position." *Birt v. Wells Fargo Home Mortg., Inc.*, 75 P.3d 640, 653 (Wyo. 2003)

---

[7] While the district court made no findings on the reasonableness of Black Card's reliance, it is well settled that we may affirm the district court on any basis supported by the record. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

(quoting *Roth v. First Sec. Bank,* 684 P.2d 93, 96 (Wyo. 1984).[8] "The elements of equitable estoppel are a lack of knowledge, reliance in good faith, and action or inaction that results in an injury." *Id.* "Equitable estoppel is similar to promissory estoppel, but equitable estoppel is a tort doctrine that requires proof of misrepresentation." *Id.*

We agree with the district court that Black Card could not have reasonably relied on Visa's representations as a basis for its change of position. Black Card claims that Visa represented "that it intended to renew the Promotional Agreement and that the parties would continue to operate on a 'business as usual' basis until reaching a new agreement." Black Card asserts it would not have purchased Visa-branded promotional materials without such representations. However, as discussed

---

[8] The district court applied Wyoming law in reviewing this claim, because equitable estoppel is considered a tort doctrine under Wyoming law, rather than a contract doctrine. *Black Card*, 2017 WL 3600721 at *7 (citing *Birt*, 75 P.3d at 653). The court concluded the alleged tort was committed in Wyoming and is therefore governed by Wyoming law. *Id.*; *see Duke v. Housen*, 589 P.2d 334, 341 (Wyo. 1979); *Jack v. Enterprise Rent-A-Car Co. of Los Angeles*, 899 P.2d 891, 894 (Wyo. 1995).

Visa asserts in a footnote that California law should apply to the equitable estoppel claim but hedges its bets by arguing the issue under both Wyoming and California law. Visa's cursory choice-of-law argument is not enough to count as proper presentation of the issue on appeal. *See Bronson v. Swenson*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."). But even assuming the footnoted argument was sufficient to avoid waiver, we need not resolve the choice-of-law question. Black Card loses under either Wyoming or California law. Black Card has not established the requirements of Wyoming equitable estoppel, and under California law there is no stand-alone cause of action for equitable estoppel. *Moncada v. W. Coast Quartz Corp.*, 164 Cal. Rptr. 3d 601, 632 (Cal. Ct. App. 2013); *Behnke v. State Farm Gen. Ins. Co.*, 127 Cal. Rptr. 3d 372, 387–88 (Cal. Ct. App. 2011); *Money Store Investment Corp. v. So. Cal. Bank*, 120 Cal. Rptr. 2d 58, 65 (Cal. App. 2002).

above, it would not have been reasonable for Black Card to rely on Visa's "business as usual" statement as an assurance that the parties would reach an agreement.

Further dooming the equitable estoppel claim, there is no "proof of misrepresentation" by Visa. *See Birt*, 75 P.3d at 653. Black Card claims that Visa represented that it would continue "business as usual" while the parties negotiated— and that is what occurred. Visa never represented that the negotiations would be successful. Because no misrepresentation occurred here, and Black Card was never misled into believing that a renewed Promotional Agreement was a certainty, the district court properly granted summary judgment to Visa on the promissory and equitable estoppel claims.

### D.

Black Card's final claim for relief is under the theory of unjust enrichment. We conclude the evidence is sufficient for a reasonable factfinder to find that unjust enrichment occurred here. Accordingly, we reverse the district court's grant of summary judgment for Visa.

To prevail on a claim of unjust enrichment, a plaintiff must prove that: (1) valuable services were rendered; (2) to the party to be charged; (3) which services were accepted, used, and enjoyed by the party to be charged; and (4) that the services were furnished under such circumstances as would reasonably notify the party to be charged that the plaintiff, in rendering such services, expected to be paid by the party

to be charged. *Jacoby v. Jacoby*, 100 P.3d 852, 855 (Wyo. 2004).[9] The fourth element is actually two elements: "[n]ot only must the proponent of the theory prove that the circumstances were such that the other party was reasonably notified that the proponent expected to be paid for services rendered or materials furnished, but the proponent must prove that without such payment, the party would be unjustly enriched." *Id.* at 856 (quotation and brackets omitted).

"Unjust enrichment is an equitable remedy that is appropriate only when the party to be charged has received a benefit that in good conscience the party ought not retain without compensation to the party providing the benefit." *Id.* Unjust enrichment is meant to prevent a person from "enrich[ing] himself at the expense of another[.]" *Boyce v. Freeman*, 39 P.3d 1062, 1066 (Wyo. 2002) (quotation omitted).

Black Card argues that the record supports its unjust enrichment claim, and therefore the district court's dismissal of that claim was in error. It claims to have rendered valuable services by marketing the co-branded credit card, and that Visa accepted those services by approving the marketing materials. Because Visa earned fees each time a Black Card credit card was used, Visa enjoyed the benefit of those services. And Black Card claims that Visa was clearly on notice that Black Card expected payment for those services, because Visa had paid Black Card over the course of their prior dealings.

---

[9] The parties and the district court agreed that Wyoming law applies to this claim. *Black Card*, 2017 WL 3600721 at *4. Because neither party argued the issue on appeal or before the district court, we apply Wyoming law.

The district court granted summary judgment by focusing on Black Card's claim in its Second Amended Complaint that it was entitled to "a percentage of the revenue Visa received under the Black Card program." A47–48. It noted that Black Card could not claim such a percentage of revenues: even under the Promotional Agreement, the incentive payments were based off year-over-year program sales volume increase, not the revenues Visa obtained from each usage of the credit cards. *See* SA152. The district court determined that because Visa's revenue stream came through Barclays—not Black Card—and because Visa earned those revenues by processing credit card transactions, Visa was not unjustly enriched.

The district court focused too narrowly on Black Card's request for a "percentage of revenue" in the Second Amended Complaint. The heart of Black Card's claim is that it rendered valuable services to Visa by marketing the co-branded credit card, and it was entitled to, and expected to receive, payment for those services. Black Card may have incorrectly characterized the expected payment in the Second Amended Complaint as a "percentage of revenue Visa received under the Black Card program," but it later made clear that its expected payment would be analogous to the incentive payments under the Promotional Agreement. *See* A145, Black Card's Resp. to Visa Mot. Summ. J. on Counts VIII and IX ("Visa accepted Black Card's valuable services under circumstances which reasonably notified it that Black Card expected to be paid an incentive payment."). The district court incorrectly focused on the revenue model of the Visa/Barclays/Black Card relationship without adequately addressing the substance of Black Card's argument.

25

We conclude that Black Card has made out an unjust enrichment claim that survives summary judgment. Black Card's marketing of the co-branded credit card could be considered a valuable service rendered to Visa, satisfying elements (1) and (2) of Wyoming's unjust enrichment framework. Visa appeared to accept the service by approving the marketing materials throughout 2014, satisfying element (3). Based on the parties' prior course of business—which involved Visa paying Black Card—it is possible that Visa was on notice that Black Card expected to be paid for the value of its marketing efforts, satisfying element (4).

Visa argues that Black Card could not have expected payment for the marketing materials because of two email communications between the parties. The first email, sent on December 2, 2013, stated: "From a contract perspective, if we can target signing a new contract by March 31, 2014, we will not have any interruption in payments to Black Card." SA910. The second, sent on February 18, 2014, stated that Visa had processed "the final payment owed to Black Card under the terms of our expired agreement." SA338. Visa contends that against the backdrop of these communications, Black Card could not have a reasonable expectation of payment. But this is a factual dilemma that should be decided by a factfinder.

Visa also argues that because Black Card's marketing efforts were primarily for Black Card's own benefit, its unjust enrichment claim should fail. In other words, because the marketing materials' primary purpose was enhancing Black Card's business, and Visa enjoyed only a "secondary" benefit, it would not be equitable for Visa to compensate Black Card. However, Visa's sole source of

authority regarding this "primary" versus "secondary" distinction is a factually dissimilar Utah case. *See* Aple. Br. at 50 (citing *Jones v. Mackey Price Thomson & Ostler*, 355 P.3d 1000, 1018–19 (Utah 2015)). We are aware of no controlling rule of law that the benefit conferred by the plaintiff must be wholly gratuitous.

For the foregoing reasons, we reverse the district court's grant of summary judgment for Visa on Black Card's unjust enrichment claim.

**E.**

Because it granted summary judgment for Visa on all of Black Card's claims, the district court also dismissed Black Card's request for punitive damages. *See Cook v. Shoshone First Bank*, 126 P.3d 886, 897 (Wyo. 2006) ("A claim for punitive damages is an element of a cause of action; it does not constitute a separate claim or cause of action. Summary judgment on the underlying claims effectively dispose[s] of the punitive damages claim and no further discussion is necessary." (citation omitted)).[10]

Our disposition revives Black Card's claims for breach of implied contract and unjust enrichment. Accordingly, on remand Black Card may proceed with its claim for punitive damages based on these reinstated causes of action. We express no opinion on the propriety of punitive damages; any arguments on the subject may be brought before the district court on remand.

---

[10] As with the unjust enrichment claim, the parties did not contest before the district court that Wyoming law applies to the punitive damages claim. *Black Card*, 2017 WL 3600721, at *2. Both sides cite Wyoming law on appeal.

## III.

For these reasons, we REVERSE the district court's grant of summary judgment for Visa regarding Black Card's claims for breach of implied contract, unjust enrichment, and punitive damages. We AFFIRM the district court in all other respects. The case is remanded for further proceedings consistent with this opinion.


Entered for the Court


Allison H. Eid
Circuit Judge